# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MARY TERESA HELSEL,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | CIVIL ACTION NO. H-13-00487 |
| **CAROLYN W. COLVIN,** | § | |
| Acting Commissioner of Social | § | |
| Security Administration | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM AND ORDER

Pursuant to 42 U.S.C. §405(g), Plaintiff Mary Teresa Helsel ("Helsel") seeks review of a final determination by Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), that she is not entitled to receive Social Security disability benefits. The parties have consented to have this Court conduct all proceedings, pursuant to 28 U.S.C. § 636(c). Dk. 4. Before the Court is Helsel's Motion for Summary Judgment and Supporting Brief and the Commissioner's Motion for Summary Judgment and Supporting Brief. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court orders that Helsel's Motion is **DENIED** and summary judgment is **GRANTED** for the Commissioner.

## I. BACKGROUND

Helsel was born in 1955 and suffers from numerous physical and mental health issues. She has a twelfth-grade education. Tr. 164. She has past work experience as an auditor, a customer service account manager, and a mailing labeler. Tr. 35, 165. Helsel lives with her husband, who is the sole income provider for the household and who does the cooking and grocery shopping. Tr. 48. Helsel alleges that she suffers from numerous physical problems, including pulmonary asthmatic bronchitis, sinusitis, allergic rhinitis, osteoporosis, fibromyalgia, multifocal choriditis, vision problems including macular scars, temporomandibular joint disorder ("TMJ"), depression, and posttraumatic stress disorder ("PTSD"). Tr. 28, 164, 45-47, 196. Helsel alleges she became disabled on November 3, 2009. Tr. 164. From November 3, 2009, through the date of the Administrative Law Judge hearing, Helsel received unemployment benefits. Tr. 32.

### A. Medical Records

#### 1. Osteoporosis

In March 2008, Dr. Byron Holt performed a bone density scan indicating Helsel had osteopenia. Tr. 419-420. An additional bone density scan in April 2010 also indicated osteopenia. Treatment with calcium supplements, Estrogen Replacement Therapy, Hormone Replacement Therapy, Miacalin, Multi-Vitamins, and Vitamin D supplements was suggested by Dr. Holt. Tr. 462.

#### 2. Work-Related Arm Injury

In September 2009, Helsel sought treatment for a work-related fall from her family physician, Dr. Ata Salek. Tr. 309. Helsel complained of pain in her right arm. *Id.*

A September 2, 2009 X-ray showed no fracture or dislocation. Tr. 306. Dr. Salek indicated Helsel would be able to return to work that very day. Tr. 308.

3. Pulmonary Disorders

In February 2010, Helsel saw Dr. Salek for a sore throat, coughing, and chest congestion. Tr. 298. A chest X-ray on February 25, 2010 showed no abnormalities. Tr. 297. In May 2010, Helsel returned to Dr. Salek, again complaining of a cough, sore throat, and wheezing. Tr. 294. A June 7, 2010 X-ray of Helsel's sinuses and chest showed no evidence of sinusitis or acute abnormality in Helsel's chest. Tr. 280.

On June 8, 2010, Dr. Salek ordered CT scans of Helsel's chest, paranasal sinuses, and head. These scans indicated minimal degenerative changes in her spine and "minimal patchy haziness" in her lungs, possibly representing "minimal infiltrate" and mild chronic sinusitis. Tr. 282-287, 354-356. Helsel's head CT was "unremarkable with no acute brain event identified." Tr. 358.

On June 10 2010, Helsel met with Dr. Daria Lee, an internal medicine and pulmonology specialist. Tr. 235-237. Dr. Lee performed a spirometry which showed mild restriction of the airways, indicating the possible existence of "asthmatic bronchitis," gastro esophageal reflux disease, and obstructive sleep apnea. *Id.* Dr. Lee recommended an inhaler, Z-pack, Prednisone, an esophageal pH test, and a follow-up CAT scan of Helsel's chest. *Id.*

A spirometry performed in July 2010 indicated normal results. Tr. 224-234. A CT of Helsel's thorax in July 2010 revealed "minimal patchy densities predominantly in the left lung" indicating Helsel's condition had slightly worsened since June 2010. Tr.

352.  A follow-up chest CT on November 1, 2010 reported "no significant abnormality."

Tr. 350-351.   A follow-up spirometry in December 2010 indicated a "moderate

obstruction."  Tr. 502-511.

    4.  <u>Sleep Apnea</u>

In July 2010, Helsel visited the Memorial Premier Sleep Center for a sleep study.

Tr. 276-277.  The letter of interpretation reported that Helsel had an Epworth sleepiness

scale score of 11, indicating moderate daytime sleepiness, "no sleep apnea," and

"obesity."  *Id.*  The report recommended improved sleep hygiene, regular diet and

exercise, and an ENT evaluation for snoring.  *Id.*

    5.  <u>Heart and Gastrointestinal Health</u>

In August 2010, Helsel visited Dr. Radwan Al-Sabbagh for an endoscopy, the

results of which were normal.  Tr. 398-403.  In September 2010, upon referral of Dr.

Salek, Helsel saw Dr. Mizra Baig, a cardiologist.  Tr. 333-339.  Dr. Baig performed an

echocardiogram, which showed normal systolic function with an EF between 55% and

60% percent.  Tr. 333-338.

    6.  <u>Fibromyalgia</u>

In December 2010, Helsel went to C&M Wellness and Rehab Center complaining

of neck and back pain, predominately on her left side.  Tr. 497-501.  Helsel reported a

pain rating of nine out of ten.  *Id.*  Notes from Helsel's visit on December 8, 2010

indicate, "Pt is a 55 y/o female presenting body pain… pt has had the pain for 6 months."

Tr. 500.  During this visit, Helsel claimed her medical history included fibromyalgia.

The initial treatment from this visit consisted of, "intial eval., therapeutic eval, manual

therapy." *Id.* The notes also indicate "improved function." *Id.* On December 13, 2010, Helsel reported that her "neck hurts a little bit," which accompanied "tenderness, spasms, and restrictions" at her cervical spine. Tr. 498.

In May 2011, Helsel visited Dr. Abigail Neiman complaining of body pain. Tr. 527-529. On May 2, 2011 it was noted that Helsel's "last injection in rt thumb only lasted 1 week – but still achey, weakness. [E]xercising and walking every day, has been busy working in yard and house." Tr. 529. Dr. Neiman performed a fibromyalgia tender point survey, applying pressure to specific points of Helsel's body and noting whether she felt any pain from that pressure. Helsel reported tenderness at all eighteen tender points of the survey. *Id.* Notes from May 23, 2011 indicate Helsel's physical exam, including an examination of her skin, head, neck, chest, heart, vascular, abdomen, genitals, muscles, and neuro psychopathy, were "within normal limits." Tr. 528.

During the month of July 2011, Helsel saw Dr. Neiman for back and neck pain. Tr. 680-686. Notes from July 20, 2011 indicate the results of Helsel's physical exam were again within normal limits. *Id.* However, the fibromyalgia tender points survey indicated that Helsel reported tenderness in all eighteen points. Tr. 681.

7. Depression and Post-Traumatic Stress Disorder

In August 2010, Dr. Salek referred Helsel to Dr. George Vroulis, a clinical psychologist, regarding her reported symptoms of depression. Tr. 625-636. Helsel reported insomnia, low energy levels, headaches, backaches, low libido, suicidal ideations, hallucinations, depression, and anxiety. *Id.* Dr. Vroulis's notes indicate that diagnoses of post traumatic stress disorder, major depression, and fibromyalgia "could

not be ruled out." *Id.* A September 22, 2010 letter from Dr. Vroulis certifies that he saw Helsel on several occasions from August 2010 to September 2010, and opines that Helsel suffers from "major depression with mood congruent psychotic features in addition to posttraumatic stress disorder related to past severe forms of abuse." Tr. 601. Dr. Vroulis reported that, "the level of severity of these diagnoses incapacitates her and makes her daily living activities dysfunctional." *Id.*

In December 2010, Helsel visited Dr. Salek seeking medication for her depression. Tr. 564-566. She reported consistent crying spells and feelings of loneliness in the previous weeks. *Id.* Later that month, Helsel returned to Dr. Vroulis. Tr. 589-591. During this visit, Helsel reported insomnia partially due fibromyalgia pain, complete loss of appetite, fluctuating energy levels, suicidal ideations, paranoid ideations, hallucinations, dizziness, depression, and moderate anxiety. *Id.* Dr. Vroulis recorded an impression of severe PTSD and major depression with congruent psychotic features. *Id.* Dr. Vroulis recommended continued cognitive psychotherapy, mixed with psychoanalytic approaches and continued use of antidepressant medications. *Id.*

In March 2011, Helsel returned to Dr. Vroulis reporting similar symptoms and stating that she could not work anymore, her insomnia had worsened, and her nightmares had continued. Tr. 584-588. In April 2011, Helsel reported an increase in the same symptoms. Tr. 577-583. Dr. Vroulis recorded the same impressions of PTSD and major depression and the same recommendations of cognitive psychotherapy and antidepressants. *Id.* In May 2011, Helsel returned to Dr. Vroulis, but this time reported a "good" appetite, "ok" energy levels, significantly reduced suicidal ideations, occasional

paranoid ideations, and one instance of a hallucination. Tr. 574-576. The progress notes further reflect "moderate to severe depression" and "moderate to severe anxiety." *Id.* Dr. Vroulis again recommended cognitive psychotherapy and the continued use of medication. *Id.*

In June 2011, Dr. Vroulis' progress report indicated Helsel was "less depressed but still anxious," had a stable appetite, fluctuations in energy levels, and occasional suicidal ideations and hallucinations. Tr. 571-573. Dr. Vroulis again repeated his previous recommendations. *Id.* In July 2011, Dr. Vroulis reported similar symptoms, but recommended adjustments to Helsel's medication to regulate side effects. *Id.*

8. Dr. Spoor's Physical RFC

Dr. Scott Spoor, a medical consultant, completed a Physical Residual Functional Capacity assessment indicating that Helsel would be able to occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for a total of six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Tr. 311-317. The RFC further indicated no environmental, communicative, visual, or manipulative limitations. *Id.*

**B. Application for Social Security Benefits**

Helsel applied for Social Security benefits on June 24, 2010. Tr. 163-171. Helsel stated that she was disabled as of November 3, 2009, due to her chronic obstructive pulmonary disease, osteoporosis, and macular scars in her eyes. *Id.* Helsel's request for benefits was initially denied on August 10, 2010, and again upon reconsideration on November 29, 2010. Tr. 76-77, 84-86. Helsel filed a request for a hearing before an Administration Law Judge ("ALJ") on December 6, 2010. Tr. 87-88.

## C. ALJ Hearing and Decision

Helsel's hearing occurred before ALJ Donald Willy on August 17, 2011.  Tr. 26-73.  Helsel was represented by counsel at the hearing.  *Id.*  At the hearing, Helsel stated that she stopped working in November of 2009 and began receiving unemployment benefits after that time.  Tr. 32-34.  Helsel testified she was still receiving unemployment benefits and that she had applied for full-time and part-time jobs.  *Id.*

However, Helsel also testified she was actually prevented from working because she could not sit for long periods of time due to severe back and hip pain, as well as poor memory and an inability to multitask.  Tr. 35.  Helsel stated she experienced pain "all day, every day," and that, in spite of medication, her pain levels ranged from an eight to ten out of ten.  Tr. 36-37.  Helsel further claimed that without medication, her pain "is a 10 or worse" and that it was "the worst pain [she'd] ever felt."  *Id.*  Helsel testified that she could not sit or stand for more than thirty minutes at a time and could not walk more than half a block without taking a break.  Tr. 43-44.  Helsel also claimed that she became fatigued after light activities.  Tr. 37-38.  Helsel testified that she is allergic to "just about anything in the air," which results in shortness of breath.  Helsel also claims to suffer from TMJ, which causes "soreness in her jaws."  Tr. 40.

Next, Helsel testified that she had macular scar degeneration and cysts in both eyes, causing blurred vision and hindering her ability to read small print.[1]  Tr. 41. Helsel

---

[1] From 2008 to 2011, Helsel sought treatment for several eye conditions including multifocal choroiditis, disseminated retinitis, and macular retinal cyst.  *See, e.g.*, Tr. 244-249, 516-518.  Despite these diagnoses, the ALJ found her vision-related conditions "not severe."  Tr. 15.  Helsel does not challenge this finding.

stated that she suffers from depression, crying spells, and anxiety attacks two to three times a week. Tr. 46. She treats these symptoms with medication and counseling sessions with Dr. Vroulis. Tr. 45-47.

Dr. Kaneese, an impartial medical expert ("ME"), testified about Helsel's alleged physical and mental impairments. Tr. 50-66. Dr. Kaneese testified that half of Helsel's pulmonary tests had been "close to normal," and that the tests showed improvement. Tr. 51. Regarding Helsel's osteoporosis, Dr. Kaneese testified that Helsel's electromyogram of her upper and lower extremities showed normal results and an echocardiogram demonstrated an ejection fraction of 55 to 60 percent, also within normal range. *Id.*

Regarding Helsel's fibromyalgia, Dr. Kaneese testified that the medical records did not contain a manual trigger point survey, but that December 2010 records indicate Helsel's condition was "stable." Tr. 52. Further, Dr. Kaneese testified that Helsel did not mention any issues with fibromyalgia at her next appointment in July 2011. Tr. 52. Dr. Kaneese noted that an evaluation of Helsel's fibromyalgia was completed in September 2010, but that evaluation was conducted by a nurse. Tr. 59-60. Dr. Kaneese further testified about the subjective nature of the symptoms of fibromyalgia, stating that he personally did not consider the tender points test to be a "scientifically valid" method to diagnose fibromyalgia. Tr. 66.

Regarding Helsel's mental limitations, Dr. Kaneese testified that Helsel's cognitive skills were satisfactory based on her answers to a longitudinal study. Tr. 52-53. Dr. Kaneese stated that based on his review, any psychiatric or behavior problems were "not severe" or "stable." Tr. 54.

Dr. Kaneese testified that Helsel's back and neck pain were "not severe," that her lung disease was "severe," and that based on her Residual Functional Capacity ("RFC"), she could perform work at a "light level of physical exertion," but could not work around smoke, fumes, or pulmonary irritants. Tr. 52. Dr. Kaneese's assessment indicated Helsel would be able to maintain a forty-hour workweek consisting of eight hours a day with six hours of sitting, six hours of standing, standard breaks, and avoiding fumes and pulmonary irritants. *Id.*

A vocational expert ("VE"), Ms. Lori McCray, also testified. Tr. 67-72. Ms. McCray responded to a hypothetical question posed by the ALJ, stating that, assuming the ME's testimony was accurate, a hypothetical person with Helsel's characteristics and RFC would be able to perform all of Helsel's past relevant work, because they were all sedentary, skilled occupations. Tr. 67-68. The ALJ then changed the hypothetical and asked the VE to assume that such a hypothetical person was only capable of performing unskilled work with an RFC for light work. *Id.* The VE testified that such a person would be able to perform Helsel's past job as a labeler. *Id.* The ALJ then asked the VE to assume Helsel's treating physician's RFC was correct. Tr. 68-69. The VE testified that, assuming an RFC of light work with the applicable environmental limitations, psychological limitations, behavioral abnormalities, and concentration deficiencies described by Helsel's treating physician, such a person would be unable to perform any of Helsel's past relevant work or any other jobs in the competitive economy. *Id.*

On January 26, 2012, ALJ Willy issued an opinion finding that Helsel was not disabled. Tr. 9-20. The ALJ found that the Helsel met the insured status requirement of

the Social Security Act through April 30, 2021, and that she had not engaged in substantial gainful activity since her alleged onset date of November 3, 2009.  Next, the ALJ concluded that Helsel had five "severe" impairments: pulmonary asthmatic bronchitis, sinusitis, allergic rhinitis, osteoporosis, and fibromyalgia.  *Id.*

The ALJ indicated he afforded "substantial and great weight" to the opinions of the testifying expert, Dr. Kaneese, who opined that Helsel could perform work at the light level of physical exertion, but could not work around smoke, fumes, or pulmonary irritants.  Tr. at 18.  The ALJ also afforded "great weight" to Dr. Spoor's opinion that Helsel was capable of performing work at the light level of physical exertion.  *Id.*  The ALJ reviewed medical records from all of Helsel's treating physicians and accorded them varying degrees of weight based on whether they were consistent with Helsel's statements and the record as a whole.

The ALJ found Helsel's impairments, singularly or in combination, did not equal a listing-level impairment.  Further, he found that Helsel had the RFC to perform light work but could not be around smoke, fumes, or pulmonary irritants.  Tr. 19.  The ALJ found that, although Helsel's medically determinable impairments could reasonably be expected to cause her symptoms, Helsel's statements concerning the intensity, persistence, and limiting effects of her symptoms were not "wholly credible" to the extent they were inconsistent with the RFC assessment.  Tr. 16.  In addition to the objective medical evidence, the ALJ also reviewed evidence that Helsel had filed for and received unemployment benefits, noting such benefits required Helsel to affirm that she was "ready, willing and able to work" and such a statement "reflected poorly on [her]

credibility." Tr. 17.  Accordingly, because Helsel could perform the functional demands and duties of her past work as an auditor, customer service account manager, and labeler, he found she was not disabled.  Tr. 20.

Helsel requested Appeals Council review, which was denied on January 9, 2013. Tr. 1.

## II.     SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp.*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.* 529 F.3d 335, 339 (5th Cir. 2008).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.    STANDARD OF REVIEW

When judicially reviewing a determination that an applicant is not entitled to benefits, we determine "(1) whether the Commissioner applied the proper legal standard; and (2) whether the Commissioner's decision is supported by substantial evidence." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *see also* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990). A finding of no substantial evidence is warranted only "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (internal quotation marks and citation omitted). The court may not re-weigh the evidence in the record, nor try the issues de novo, nor substitute the court's judgment for the Commissioner's, even if the evidence preponderates against the Commissioner's decision. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

## IV.    STATUTORY BASIS FOR BENEFITS

Helsel applied for Social Security Disability Insurance ("SSDI") benefits. SSDI benefits are authorized by Title II of the Social Security Act, and provide income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

## V. DETERMINATION OF DISABILITY

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

A disability claim is examined in a five-step sequential analysis to determine whether "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue,* 501 F.3d 446, 447–48 (5th Cir. 2007). If, at any step, the claimant is determined to be disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the

national economy that the claimant is able to perform. *Id.* The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart,* 415 F.3d 457, 461–62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945. The Commissioner assesses the RFC before proceeding from step three to step four. *Id.* Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut this finding. *Id.*

## VI.   ANALYSIS

### A. Opinions of Helsel's Treating Physician

First, Helsel contends the ALJ failed to give controlling weight to the opinion of her treating physician, Dr. Salek. Helsel then claims that the ALJ failed to complete the required § 404.1527(d)(2) analysis before rejecting these opinions. Finally, Helsel contends the ALJ was required to request additional medical evidence before rejecting Dr. Salek's opinions. The Court fins these arguments unpersuasive.

Under the Social Security regulations, a treating physician's opinion on the nature and severity of a claimant's impairment should receive "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *Perez v. Barnhart,* 415 F.3d 457, 465–66 (5th Cir. 2005); *Spellman v. Shalala,* 1 F.3d 357, 364 (5th Cir. 1993). On the other hand, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the

treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel,* 209 F.3d 448, 456 (5th Cir. 2000).

If there is no other reliable medical evidence from another treating or examining physician that controverts the treating physician's opinion, then the ALJ may reject the treating physician's opinion "*only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria in 20 C.F.R. § 404.1527(d)." *Newton,* 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original). Section 404.1527(d) requires an ALJ to evaluate the opinion in light of the following: "(1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which 'tend to support or contradict the opinion.'" 20 C.F.R. § 404.1527(d); *see also* 20 C.F.R. § 416.927(d); SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996); SSR 96–2p, 1996 WL 374188, at *4 (July 2, 1996).

In this case, the ALJ conducted a thorough analysis of Dr. Salek's treatment of Helsel, finding numerous inconsistencies. For example, on September 2, 2009, Dr. Salek filled out a Certificate to Return to Work/School, indicating Helsel would be able to return to work on that very day. Tr. 308. However, Dr. Salek's September 21, 2010 RFC indicated that Helsel could only sit, stand, and walk between zero to one hour per day; lift only up to five pounds occasionally; and was likely to be absent from work more than four days a month. Tr. 488-492. The ALJ noted that there was no "evidence of any adverse impact of any event in the interim" between these opinions. Tr. 18.

The ALJ gave "great weight" to the September 2009 Certificate to Return to Work signed by Dr. Salek, finding it was consistent with the evidence of record and was therefore persuasive. Tr. 18. The ALJ gave "little weight" to the September 2010 RFC by Dr. Salek because it was inconsistent with his own treating records and other records of file. *Id.* The ALJ also did not afford Dr. Salek's RFC great weight because he was a family practitioner, and therefore, not a "medically acceptable source" for a RFC opinion. *Id.*

In contrast, the ALJ gave great weight to the testimony of Dr. Kaneese because he is board-certified in Neurological Surgery, had the benefit of reviewing the entire record, and is familiar with the Social Security regulations. *Id.* The ALJ also found that Dr. Kaneese's testimony and RFC determinations were consistent with the record and statements made by Helsel. *Id.* Similarly, the ALJ gave great weight to Dr. Spoor's opinion regarding Helsel's physical RFC, finding that Helsel was capable of performing work at a light level of physical exertion. Tr. 18.

Helsel argues that before rejecting Dr. Salek's opinion, the ALJ failed to complete the required analysis under §404.1527(d)(2). However, the ALJ did not fully reject the opinions of Dr. Salek. Instead, he gave greater weight to Dr. Salek's earlier certification that Helsel was capable of returning to work because it was more consistent with Helsel's testimony and medical history. Tr. 18. Dr. Salek's 2009 Certificate to Return to Work is "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *See Newton*, 209 F.3d at 453. Accordingly, a detailed

inquiry into each § 404.1527(d)(2) factor was unnecessary. *See Rollins v. Astrue*, 464 F. App'x 353, 358 (5th Cir. 2012).

## B. Helsel's Depression and PTSD

Helsel next contends that the ALJ erred by failing to find ther depression and PTSD "severe." A "severe" impairment is one that "significantly limits an individual's ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). An impairment is not "severe" only if it is a "slight abnormality" that has such a "minimal effect on the individual that it would not be expected to interfere with an individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

The ALJ's opinion reviewed the medical records of Helsel's mental health, including a Mental RFC completed by her treating psychologist, Dr. Vroulis. Tr. 19, 613-620. Dr. Vroulis' Mental RFC concluded that Helsel was unable to meet competitive standard settings; did not have the requisite mental abilities and aptitudes needed to do unskilled work, semiskilled work, or particular types of jobs; and had a complete inability to function outside the home. *Id.* Dr. Vroulis also found Helsel had marked restriction in activities of daily living, difficulty maintaining social functioning, and deficiencies of concentration, persistence, or pace. *Id.* Dr. Vroulis indicated Helsel had four or more episodes of decompensation. *Id.* However, the ALJ gave this opinion "little weight," noting there was no medical evidence supporting Dr. Vroulis' conclusion and that Dr. Vroulis's assessment was inconsistent with his own records as well as other records in the file and Helsel's own testimony. Tr. 19.

The Court notes that evaluations from Dr. Vroulis indicate Helsel's condition was improving due to medication and treatment, and that by June and September 2011, Helsel's depression had lessened. The ALJ noted that in June and September 2011, her depression lessened. Tr. 15, 574-576. In finding that Helsel's depression was not "severe," the ALJ further stated, "claimant's medication controls her mental impairments, she has no side effects from her medication, and she has had minimal mental health treatment." *Id*.

Helsel's testimony that her treatment with Dr. Vroulis was helping her depression, in combination with the lack of substantial evidence showing depression or PTSD, indicates that Helsel does not have a mental impairment that has "more than a minimal effect on [her] ability to do basic work activities." *See Stone*, 752 F.2d 1099. Accordingly, the ALJ did not err by finding that Helsel's depression was not "severe."

## C. Helsel's Mental RFC

Helsel argues that the ALJ's RFC failed to reflect her mental limitations and that the ALJ erred by failing to consult a medical expert. Although the ALJ does have the duty to fully develop the record, the use and consideration of medical expert testimony is solely within the discretion of the ALJ. *Dominguez v. Astrue,* 286 Fed. App'x 182, 186 (5th Cir. 2008). The Court will not reverse the decision of an ALJ for alleged failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir. 2000). To establish prejudice, a claimant must demonstrate that he or she "could and would have

adduced evidence that might have altered the result." *Id.* In this case, Helsel has not established any prejudice.

1. ALJ's Hypothetical Question to VE

Helsel complains that the ALJ's hypothetical question to the VE failed to properly account for her mental limitations. However, an ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE if the ALJ did not find the alleged limitations to be supported in the record. *Roberts v. Colvin*, 946 F. Supp. 2d 646, 662 (S.D. Tex. 2013).

Here, the ALJ found Helsel's alleged mental limitations were unsupported by the record and not "severe" because they did not pose any interference with her ability to work. To the extent Helsel wished to challenge the ALJ's hypothetical question at the hearing, her counsel had an opportunity to cross-examine the VE, but chose not to do so. *See Carey v. Apfel,* 230 F.3d 131, 146–47 (5th Cir. 2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing."). Accordingly, the ALJ's hypothetical question was not deficient and the ALJ committed no reversible error.

2. Failure to Obtain Updated Psychiatric Medical Expert Opinion

Helsel contends the ALJ failed to properly develop the case by not obtaining an updated psychiatric medical expert opinion. The Court disagrees.

The record contains voluminous medical evidence from Helsel's treating psychologist, Dr. Vroulis, in addition to testimony from Helsel regarding her mental health. As discussed in Section B above, the ALJ adequately considered Helsel's mental capacity. Although Helsel contends the ALJ should have sought a medical expert opinion regarding her mental RFC, the ALJ has discretion to do so where the record is adequately developed to render a decision. *See, e.g., White v. Soc. Sec. Admin.*, 129 F. App'x 905, 906 (5th Cir. 2005) ("the record was sufficiently developed and, therefore, the ALJ was not required to obtain additional medical expert testimony") (citing *Ford v. Sec'y of Health & Human Servs.*, 659 F.2d 66, 69 (5th Cir. 1981)). In this case, the ALJ did not err by not consulting an additional medical expert.

Helsel has not demonstrated that she "could or would have adduced evidence" that would have changed the ALJ's determination. Helsel makes the vague claim that "[c]onsultation of a qualified ME at the ALJ hearing would likely have resulted in a different outcome," yet provides no argument or citation in support of this assertion. *See Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir. 2012) *cert. denied*, 133 S. Ct. 953, 184 L. Ed. 2d 728 (U.S. 2013) ("A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden."). Moreover, Helsel has failed to explain how these ailments would have altered the ALJ's RFC assessment or otherwise impacted her ability to work. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002) (finding no prejudice where claimant presented no evidence or argument of why she could not perform her past relevant work). Accordingly, Helsel

has demonstrated no prejudice and the ALJ did not err in his analysis of Helsel's mental RFC.

**D. Helsel's Non-Exertional Impairment of Pain**

Helsel claims the ALJ erred by failing to consider the non-exertional impairment of pain and the effect of pain on her ability to work. Despite Helsel's claims, the ALJ addressed both the effects and extent of her pain, in determining her RFC.

Where subjective complaints are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the entire case record. *Eovaldi v. Astrue*, 729 F. Supp. 2d 848, 863 (S.D. Tex. 2010). The ALJ has discretion to determine a claimant's credibility. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). When the ALJ's evaluation of a claimant's subjective complaints is supported by substantial evidence, the Court will defer to the ALJ's assessments. *Eovaldi*, 729 F. Supp. 2d at 864. Here, the ALJ found that Helsel's impairments could "reasonably be expected to cause the alleged symptoms," however, he deemed her statements concerning the intensity, persistence, and limiting effects of these symptoms "not credible" to the extent they were inconsistent with the record as a whole and the RFC assessment. Tr. 16.

Helsel's statements regarding the subjective pain she experienced from some of her injuries were not consistent with her stated limitations and daily activities. Helsel testified that she received unemployment benefits with the Texas Workforce Commission, which requires applicants to certify that they are ready, willing, and able to do work. Tr. 32. Helsel indicated she had been actively applying for full- and part-time

jobs, and she believed there was part-time work she would be able to do.  *Id.*  The ALJ indicated these actions "reflect[ed] poorly on [Helsel's] overall credibility."  Tr. 17.  At her hearing, Helsel testified she could not sit longer than thirty minutes, however, the ALJ noted she sat during the entire hearing, which lasted over an hour.  *Id.*

The ALJ discussed Helsel's allegations of pain, but found medical evidence and Helsel's testimony did not support those allegations.  Helsel claimed she suffered from osteopenia, causing her low back and hip pain—however, an April 2010 bone densitometry report showed normal results.  *Id.*  Helsel also reported she exercised and walked every day and that she had been busy working in her yard and house.  Tr. 18.  Similarly, in discussing Helsel's fibromyalgia, the ALJ noted there was minimal evidence substantiating a diagnosis of the disease or Helsel's inability to work.  Tr. 18.  The ALJ noted that in May 2011, Helsel did not have any tender points, and her nerve conduction and electromyography findings were all within normal limits.  *Id.*  The ALJ also noted that Helsel's fibromyalgia was "stable" in October 2010 and May 2011.  *Id.*  Accordingly, the record contains substantial evidence to support the ALJ's determination that Helsel had the ability to perform light work and the ALJ properly considered the effect of pain when determining Helsel's RFC.

**E. ALJ's Reliance on ME**

Helsel contends that the ALJ's reliance on the ME was misplaced.  Helsel first takes issue with the ME's admission that he did not read the entire medical record. Helsel argues that the ME first testified that a manual trigger point survey was not in the

record, but that upon cross-examination was directed to a document containing a manual trigger point survey.  The Court finds these arguments unpersuasive.

Helsel does not point to any caselaw stating that a testifying ME must have read and memorized every document contained in the medical record for his or her testimony be considered reliable.  Instead, the ALJ decides the proper weight to afford ME testimony. *See, e.g., Chambliss v. Massanari,* 269 F.3d 520, 523 n.1 (5th Cir. 2001) ("The relative weight to be given [testifying medical experts and medical records] is within the ALJ's discretion.").  Here, the ALJ did not make his determinations based solely on the testimony of the ME, but considered the medical record as a whole.

Next, Helsel contends that the ME "openly, willfully rejected" the Administration's criteria for determining whether a claimant suffers from medically-determinable fibromyalgia.  However, this argument does not accurately reflect the ME's testimony.  Tr. 62-67.  During the hearing, the ME specifically stated, "No, I'm not rejecting [the tender points survey], I'm accepting scientific studies.  If you don't meet the scientific study, then it's not a scientific study.  It's not me rejecting them, it's people trying to bring information and trying to make it scientific so it's acceptable in a scientific community." Tr. 65.  In his testimony, the ME discussed the subjective nature of fibromyalgia and the current methods of testing for the ailment.  *Id.*  The Court notes that the ME's opinions were similar to other opinions, such as those of Dr. Spoor, which Helsel does not challenge.  Accordingly, the ALJ did not err by according "great weight" to the ME's opinions.

**CONCLUSION**

A review of the record reveals that the ALJ applied the appropriate legal standards in making his determination. Additionally, substantial evidence supports the ALJ's determination that Helsel is not disabled under the relevant provisions of the Social Security Act. A review of the pleadings and the record on file reflects that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56. Accordingly, the Court rules that Helsel's Motion for Summary Judgment is **DENIED** and that the Commissioner's Motion for Summary Judgment is **GRANTED**.

SIGNED at Houston, Texas on November 21, 2014.

George C. Hanks, Jr.
United States Magistrate Judge